No. 11-3705

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| TEAMSTERS LOCAL UNION 705, *et al.*, | ) |
| | ) |
| Plaintiffs-Appellants, | ) |
| | ) |
| -v- | ) |
| | ) |
| BURLINGTON NORTHERN SANTA FE, LLC, | ) |
| a Delaware limited liability company, *et al.*, | ) |
| | ) |
| Defendants-Appellees. | ) |

Appeal from the United States District Court
For the Northern District of Illinois
Case No. 11 C 7378
The Honorable Samuel Der-Yeghiayan

### APPENDIX OF PLAINTIFFS-APPELLANTS

**VERNOR MORAN, LLC**
Nicholas C. Kefalos
IL ARDC # 6270051
27 North Wacker Drive, Suite 2000
Chicago, Illinois 60606-2800
(312) 264-4460
(312) 264-4461 (fax)
nkefalos@vernormoran.com
Attorneys for Plaintiffs-Appellants

## TABLE OF CONTENTS
### (Appendix)

29 U.S.C.A. § 1140 (West 2006) Interference with Protected Rights.......................1

Amended Complaint for Damages and Equitable Relief..................................2-21

Plaintiffs' Combined Response to All Defendants' Motions to Dismiss.............22-45
the Amended Complaint

## 29 U.S.C.A. § 1140 (West 2006) Interference with Protected Rights

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act. In the case of a multiemployer plan, it shall be unlawful for the plan sponsor or any other person to discriminate against any contributing employer for exercising rights under this chapter or for giving information or testifying in any inquiry or proceeding relating to this chapter before Congress. The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| TEAMSTERS LOCAL UNION 705 | ) |
| | ) |
| -and- | ) |
| | ) |
| JOHNNY R. THOMAS, JAMES J. KANE, | ) |
| FELIPE GONZALEZ, JOSE A. MORALES, | ) |
| RICHARD W. KASSL, and | ) Judge Der-Yeghiayan |
| SANTOS M. MARINEZ, all in addition to or | ) |
| in the alternative to TEAMSTERS | ) |
| LOCAL UNION 705, all individuals being | ) |
| members of said union, for themselves, and as | ) |
| representatives of the affected class of persons | ) |
| who are members of TEAMSTERS LOCAL UNION 705, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -v- | ) |
| | ) |
| BURLINGTON NORTHERN SANTA FE, LLC, | ) |
| a Delaware limited liability company, | ) |
| BURLINGTON NORTHERN SANTA FE | ) Case No. 10-cv-7378 |
| CORPORATION, BNSF RAILWAY COMPANY, | ) |
| Delaware corporations, and SANTA FE TERMINAL | ) |
| SERVICES, INC., a Delaware corporation, | ) |
| | ) |
| -and- | ) |
| | ) |
| BERKSHIRE HATHAWAY, INC., a Delaware corporation, | ) |
| | ) |
| -and- | ) |
| | ) |
| RAIL TERMINAL SERVICES, INC., a Delaware | ) |
| corporation, RAIL MANAGEMENT SERVICES, LLC, | ) |
| a Washington corporation, CARRIX, INC., a Washington | ) |
| corporation, | ) FILED VIA E-FILING |
| | ) |
| -and- | ) |
| | ) |
| TRANSPORTATION COMMUNICATIONS | ) |
| INTERNATIONAL UNION, | ) |
| | ) |
| Defendants. | ) |

2

# AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

## Preliminary Statement

1.      This is a class action brought pursuant to the Employment Retirement
Income Security Act, ("ERSIA"), 29 U.S.C. sect. 1001, et seq., and in accord with
Inter-Modal Rail Employees Association, et al., v. Atchison, Topeka and Santa Fe
Railway Company, et al., 520 U.S. 510 (1997), by a union and its members ("union"
or "Teamsters") alleging that Defendants have impermissibly conspired against the
Teamsters and that the Defendants have willfully violated the mandates of ERISA
by discharging all Teamsters for the purpose of interfering with the attainment of
rights to which the Teamsters would have become entitled to under the ERISA
pension and welfare plan adopted under collective bargaining agreements
("Teamster plan") with Defendants.

## Jurisdiction

2.      Plaintiffs invoke the jurisdiction of this Court under 28 U.S.C. §§ 1331,
1343, and 1367.  Federal jurisdiction is appropriate in this instance to secure
protection and to redress deprivation of rights conferred by federal law, including but
not limited to 29 U.S.C. § 1132.

## Venue

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), in that a
substantial part of the events giving rise to the claims in the present lawsuit arose in
this district.

3

## Parties

4.     Plaintiff, Teamsters Union Local 705, also known as Truck Drivers, Oil Drivers, Filling Station and Platform Worker's Local Union 705, is chartered by the International Brotherhood of Teamsters, and is the representative union of all individual Plaintiffs named herein.  Teamsters Union Local 705 represents approximately 166 members who are employed at the Corwith Intermodal Rail Yard, ("Corwith"), which is located at 3526 West 43rd Street, Chicago, Illinois 60632-3419.  All 166 Teamsters have recently been notified, whole-scale, across-the-board, that they all will be discharged from their current employment with Defendants (or their agents) and the Teamsters will lose all rights to which they would have become entitled to under the ERISA pension and welfare plan agreed to by Teamsters Local Union 705, based principally (upon information and belief) their mutual association and the Teamster plan.  The principal place of business of Teamsters Union Local 705 is Chicago, Illinois.

5.     Plaintiff, Johnny R. Thomas, an African-American male, is a citizen of the United States, is a resident of Illinois, and is a member of Teamsters Union Local 705.  He works at Corwith and has recently been notified that he will be discharged from his employment with Defendants and that he will lose all rights to which he would have become entitled to under the ERISA pension and welfare plan agreed to by the Teamsters and Defendants.  He believes his discharge is principally due to his affiliation and association with the Teamsters and the Teamster plan.  He has applied to keep his current job with Defendants, he is able to continue

3

4

performing all of the tasks of his current job, has not been accepted, but even if he is re-hired by Defendants he will lose his seniority rights and any past, present, or future benefit of the Teamster plan.

6.      Plaintiff, James J. Kane, a Caucasian male, is a citizen of the United States, is a resident of Illinois, and is a member of Teamsters Union Local 705. He works at Corwith and has recently been notified that he will be discharged from his employment with Defendants and that he will lose all rights to which he would have become entitled to under the ERISA pension and welfare plan agreed to by the Teamsters and Defendants. He believes his discharge is principally due to his affiliation and association with the Teamsters and the Teamster plan. He has applied to keep his current job with Defendants, he is able to continue performing all of the tasks of his current job, and if he is re-hired by Defendants he will lose his seniority rights and any past, present, or future benefit of the Teamster plan.

7.      Plaintiff, Felipe Gonzalez, a Hispanic male, is a citizen of the United States, is a resident of Illinois, and is a member of Teamsters Union Local 705. He works at Corwith and has recently been notified that he will be discharged from his current employment with Defendants and that he will lose all rights to which he would have become entitled to under the ERISA pension and welfare plan agreed to by the Teamsters and Defendants. He believes his discharge is principally due to his affiliation and association with the Teamsters and the Teamster plan. He has applied to keep his current job with Defendants, he is able to continue performing

5

all of the tasks of his current job, and if he is re-hired by Defendants he will lose his seniority rights and any past, present, or future benefit of the Teamster plan.

8.      Plaintiff, Jose A. Morales, a Hispanic male, is a citizen of the United States, is a resident of Illinois, and is a member of Teamsters Union Local 705. He works at Corwith and has been notified that he will be discharged from his current employment with Defendants and that he will lose all rights to which he would have become entitled to under the ERISA pension and welfare plan agreed to by the Teamsters and Defendants. He believes his discharge is principally due to his affiliation and association with the Teamsters and the Teamster plan. He has applied to keep his current job with Defendants, he is able to continue performing all of the tasks of his current job, has not been accepted, but even if he is re-hired by Defendants he will lose his seniority rights and any past, present, or future benefit of the Teamster plan.

9.      Plaintiff, Richard W. Kassl, a Caucasian male, is a citizen of the United States, is a resident of Illinois, and is a member of Teamsters Union Local 705. He works at Corwith and has recently been notified that he will be discharged from his current employment with Defendants and that he will lose all rights to which he would have become entitled to under the ERISA pension and welfare plan agreed to by the Teamsters and Defendants. He believes his discharge is principally due to his affiliation and association with the Teamsters and the Teamster plan. He has applied to keep his current job with Defendants, he is able to continue performing all of the tasks of his current job, and even if he is re-hired by

5

6

Defendants he will lose his seniority rights and any past, present, or future benefit of the Teamster plan.

10.     Plaintiff, Santos M. Marinez, a Hispanic male, is a citizen of the United States, is a resident of Illinois, and is a member of Teamsters Union Local 705. He works at Corwith and has recently been notified that he will be discharged from his current employment with Defendants and that he will lose all rights to which he would have become entitled to under the ERISA pension and welfare plan agreed to by the Teamsters and Defendants. He believes his discharge is principally due to his affiliation and association with the Teamsters and the Teamster plan. He has applied to keep his current job with Defendants, he is able to continue performing all of the required tasks of his current job, has not been accepted, but even if he is re-hired by Defendants he will lose his seniority rights and any past, present, or future benefit of the Teamster plan.

11.     Defendant, Burlington Northern Santa Fe, LLC, formerly known as Burlington Northern Santa Fe Corporation, is a Delaware limited liability company, and upon information and belief, Burlington Northern Santa Fe, LLC, is a subsidiary of Defendant Berkshire Hathaway, Inc.

12.     Defendant, BNSF Railway Company, is a Delaware corporation, and upon information and belief, BNSF Railway Company, is a subsidiary of Defendant Berkshire Hathaway, Inc.

13.     Defendant, Santa Fe Terminal Services, Inc., upon information and belief, is a subsidiary of BNSF Railway Company.

7

14.     Defendant, Berkshire Hathaway, Inc., ("Berkshire Hathaway"), is a Delaware corporation, and, upon information and belief, as stated herein, Defendant Burlington Northern Santa Fe, LLC and Defendant BNSF Railway Company are both subsidiaries of Berkshire Hathaway.  Burlington Northern Santa Fe, LLC, Burlington Northern Santa Fe Corporation, BNSF Railway Company, and Santa Fe Terminal Services, Inc., along with Berkshire Hathaway will be referred to throughout collectively as "The Railroad" or BNSF or Defendants.

15.     Defendant, Rail Terminal Services, Inc., ("RTS"), is a Delaware corporation, managing Corwith.  Upon information and belief, RTS is a subsidiary of Defendant Rail Management Services, ("RMS"), a Washington corporation. Further, upon information and belief, Defendant Carrix, Inc., a Washington corporation, is the parent to both RTS and RMS.

16.     Defendant, ("TCIU") is a union who, upon information and belief, is now recognized by BNSF to be the collective bargaining representative for the employees at Corwith.

Facts

17.     Upon information and belief, at all times hereinafter referred mentioned, The Railroad, owned, was in control of, and was ultimately responsible for the premises of Corwith.  But The Railroad chose RTS to act as The Railroad's servant to assist in running Corwith from on or about May 1, 2000, up to the present day, and, upon information and belief, BNSF ran Corwith with the assistance of RTS and input from RMS and Cirrix.  Prior to that date, The Railroad operated Corwith directly through its subsidiary, Santa Fe Terminal Services, LLC.

7

8

Notwithstanding, BNSF has always acknowledged to be the owner of, in control of, and ultimately responsible for running Corwith.

18.    The Railroad, upon information and belief, had a contract with the herein mentioned agents and servants that governed this working relationship, and further course of conduct (not always in writing) governed the arrangement, over time, between The Railroad and its multiple agents. But, upon information and belief, The Railroad, at all times, had overall management control and made decisions with regard to running Corwith.

19.    The Teamsters worked with The Railroad at Corwith, and the Teamsters have continuously worked at the Corwith intermodal yard for the past 60-plus years.

20.    Sometime during this 60-plus year period, an ERISA pension and welfare plan was established for the benefit of Plaintiffs.

21.    The Defendants views the Teamster ERISA pension and welfare plan as a liability.

### Teamster Plan

22.    Teamster Local Union 705 has a pension plan that covers its union members who work at Corwith. The plan provides that all participants in the plan who earn a total of 25 or more years of future benefit service are eligible for a service pension. Unlike an early pension benefit, the pension plan's service pensions are unreduced pension benefits calculated at the highest rate and with no

reduction for age, and pensions under the plan (as an example) would be calculated based upon the following:

| Normal Pension | Years Prior to 1990: $60 per year<br>Years between 1990 to 6/1/03: $75 per year<br>Years after 6/1/03: $85 per year |
| Early Pension | Total of normal pension calculation reduced 4% per year between ages 57-65 |

23.   Thus, as an example based on the table, a participant aged 57 who has accrued 23.48 years since their hire date of 1987, under the normal pension calculation at age 65 would be approximately 1,789.90, less reduction for early commencement at age 57, would total $1,217.13.

24.   But if this same participant accrues 25 years or more of future benefit service, then under the Teamster plan, his pension would be the following regardless of age:

| Years of future benefit service | Monthly pension |
|---|---|
| 30 | $3,000.00[1] |
| 29 | $2,900.00 |
| 28 | $2,800.00 |
| 27 | $2,700.00 |
| 26 | $2,600.00 |
| 25 | $2,500.00 |

---

[1]There is an additional $100 for each year in excess of 30 years available to members under the Teamster plan.

9

25.     The Teamster plan is superior to Railroad Retirement Act, ("RRA"), social security benefits, or any 401(k) plan offered by Defendants.

26.     On or about October 18, 2010, RTS informed the union that it was permanently discontinuing its operations at Corwith and that all Teamsters would be terminated within a fourteen day period commencing on December 31, 2010.

27.     The Teamsters were told that The Railroad would operate the Corwith facility without the assistance of RTS, as The Railroad operated Corwith in the past, as was done by Santa Fe Terminal Services, LLC, which (upon information and belief) is a subsidiary of BNSF, and although Teamsters were also told that they could apply for their Corwith jobs with The Railroad, they would lose their Teamster plan; there would be "no bumping rights" for any BNSF positions at Corwith and for any employee that left The Railroad employment, and did not have compensated service with another employer covered by the RRA, before 60 months would forfeit <u>all</u> of their retirement contributions; and <u>none</u> of the contributions would be applied to social security.

28.     For those Teamsters re-hired by The Railroad, they lose all seniority; they lose all benefits including their Teamster pension, if they do not have enough years; and, they lose their health insurance coverage during a 90-day probationary period, which health insurance will not cover pre-existing conditions.

29.     As of this date, upon information and belief, The Railroad will terminate the vast majority of Teamsters working at Corwith because of their affiliation with the Teamsters and because of their ERISA pension, health and

welfare plans. Any current-Teamsters that are retained will be represented by the

Transportation Communications International Union, ("TCIU"), which is the union

hand-picked by The Railroad for the Corwith facility. Upon information and belief,

TCIU does not have a pension that is comparable to the Teamster plan and TCIU

would accept The Railroad's wage, benefit, pension, safety, and health and welfare

demands, as demonstrated by The Railroad's current contract with TCIU.

### BNSF Agreement with TCIU

30.     BNSF (upon information and belief) entered into an agreement

covering BNSF's Corwith facility with the TCIU on or before June 16, 2010,

("Agreement").

31.     This Agreement was entered into after The Railroad demanded wage,

health, pension and welfare concessions in excess of $1,000,000.00 from the

Teamsters; and, the Agreement was (upon information and belief) entered into after

the Teamsters agreed to concessions. All of this evidences bad faith on the part of

The Railroad and The Railroad's further interfere with the attainment of rights to

which the Teamsters would have become entitled to under the ERISA pension and

welfare plan adopted under previous collective bargaining agreements. RTS, RMS

and Carrix were active participants with The Railroad to interfere with the

Teamsters existing pension, health and welfare benefits, and their conduct assisted

TCIU in entering into the Agreement with the Railroad.

32.     The Agreement sets forth lower wage scales for workers employed at

Corwith than had been previously negotiated; and, the Agreement provides that

12

there will be <u>no</u> automatic application of national wage increases or lump sums negotiated by TCIU at other facilities. Further, the Agreement provides that "BNSF retains the right at its sole discretion, for any reason or no reason, to terminate th[e] Agreement in its entirety upon 60 days' written notice."

33.   The Agreement provides that BNSF will offer to eligible full-time employees covered by the Agreement a 401(k) Plan, ("Plan"), determined solely by BNSF; which Plan is non-contributory on BNSF's part; and, that the Plan may be unilaterally cancelled by BNSF upon sixty days' notice.

## Plaintiff Class Action Allegations

34.   Plaintiffs bring this action on their own behalf and on the behalf of a class of all persons similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. The Plaintiffs' class consists of all persons who work at Corwith and who are affiliated with the Teamsters and are or would have become entitled to benefits under the ERISA pension and welfare plan established for the benefit of Teamsters Local Union 705.

35.       The Plaintiff class satisfies all of the prerequisites stated in Rule 23(a):

(a)   Upon information and belief, there are no less than 166 people in Cook County, Illinois, who are members of the Plaintiffs' putative class. As such, the Plaintiffs' class is so numerous that joinder of all members is impracticable.

(b)   There are questions of law and fact common to the class. The common questions include: (1) whether the Defendants' conspired against the

12

Teamsters to deprive them of rights conferred upon them by ERISA; and, (2) whether the Defendants have willfully violated the mandates of ERISA by discharging the Teamsters for the purpose of interfering with the attainment of rights to which the Teamsters have and would have become entitled to under the ERISA pension and welfare plan adopted under any and all relevant collective bargaining agreements;

(c)     The claims of the named Plaintiffs are typical of the claims of the class. The named Plaintiffs all work at Corwith and have all recently been notified that they will be discharged from their employment by Defendants. Further, the named Plaintiffs will lose all rights to which they have or would have become entitled to under the Teamsters' ERISA pension and welfare plan. Additionally, the named Plaintiffs believe that their discharge is principally due to their affiliation and association with the Teamsters and the Teamster plan; they have each applied to keep their current job at Corwith; they are all able to continue performing all of the tasks of their current jobs; that even if any of the Plaintiffs are re-hired by Defendants they each will lose seniority rights and any past, present, or future benefit of the Teamster plan.

(d)     The named Plaintiffs will fairly and adequately represent the interests of the class. They have no interests antagonistic to the class. They seek declaratory and injunctive relief on behalf of the entire class and such

14

relief will benefit all members of the class. Also, Plaintiffs are represented by counsel who is competent and experienced in class action litigation.

36.     The Plaintiff class satisfies Rule 23(b)(2) because the Defendants have engaged in a course of conduct common to all members of the class, and final declaratory and injunctive relief in favor of the class is therefore appropriate.

**First Claim for Relief**
**(Interference with Employment Rights Protected Under ERISA and Retaliation)**

1-36.    For their First Cause of Action against the Defendants, and each of them, putative Plaintiffs, restate all allegations above as paragraphs 1 through 36 of this first claim for relief directly and by way of reference as if fully pled.

37.     Putative Plaintiffs' claims under this cause of action against Defendants hereunder is totally independent of and in no way relates to any Collective Bargaining Agreements ("CBA") between The Railroad or Defendants BNSF or SFTS or RTS or RMS or CARRIX or TCIU and any labor organizations under which putative Plaintiffs work or have worked. Nor does it relate to or depend upon any statements made in the context of any collective bargaining with putative Plaintiffs or their representatives by Defendants or RTS or RMS or CARRIX or TCIU. Nor does this Count allege conduct within the jurisdiction of the National Labor Relations Board. Nor does this cause of action have anything to do with enforcing rights under the National Labor Management Act, 29 U.S.C. §§ 157-158.

38.     Putative Plaintiffs incorporate by this reference the allegations contained in Paragraphs 1 through 37 above.

15

39.     For many years the putative Plaintiffs had a business and/or employment relationship or expectancy with Defendants whereby BNSF made contractually stipulated contributions for or directly paid putative Plaintiffs future or present ERISA-protected benefits in the form of health insurance; pension for retirement, early retirement and disability retirement; paid vacations; paid sick-leave; paid personal-leave days; and holiday pay, although this is not a suit for breach of contract. Putative Plaintiffs had a legitimate expectation of advancement and long-term continued employment with Defendant under these or similar contractual conditions, as alleged above, based upon past practice and industry custom, although this is not a suit under the common-law of torts for tortuous interference.

40.     At all times relevant to this cause of action, Defendants and RTS-RMS-CARRIX and TCIU had knowledge of putative Plaintiffs' employment relationship and benefits in their employment with The Railroad because putative Plaintiffs were employed under a written contract which fixed the terms, conditions, and benefits of their employment, to wit, the "Joint Area Cartage Agreement Covering Local Cartage Employees of Road Carriers (Motor Carrier Labor Advisory Council)(Chicago Regional Trucking Association) of Local 705, I.B. of T., an affiliate of the International Brotherhood of Teamsters, in force between April 1, 1998 to March 31, 2003; April 1, 2003 to March 31, 2008; and, April 1, 2008 to March 31, 2013, among other contracts and agreements, to which The Railroad and RTS were parties, are examples.

41.     At some time prior to the Agreement, and prior to any relationship between RTS and the Railroad, upon information and belief, Defendants decided along

15

16

with Defendants RTS-RMS-CARRIX (and later TCIU) to intentionally interfere (from time to time) with putative Plaintiffs' employment relationship with the Railroad, and their legitimate expectancy of continued direct employment with The Railroad for the express purpose of depriving putative Plaintiffs of or reducing the levels of the ERISA-protected "fringe" benefits of their employment, as alleged in the preceding paragraphs, and in so acting Defendants were substantially motivated by benefits-avoidance motives in violation of ERISA §§ 510 and/or 511.

42.    The putative Plaintiffs have been set up to receive or be credited with or be eligible for substantially lower ERISA-protected employment "fringe" benefits than those they had received or would enjoy or be credited with when they were employed by The Railroad. In discharging putative Plaintiffs as employees and bringing in Defendant RTS and now TCIU to perform the intermodal work at the Corwith Yard, all Defendants, collectively, have unilaterally acted to deprive putative Plaintiffs of continued coverage under the RRB to destroy or reduce putative Plaintiffs' eligibility for RRB disability insurance and RRB pensions, and substantially or wholly impair putative Plaintiffs from enjoying any, many, or most of the fruits of their past years of labor under the RRB system.

43.    The termination of putative Plaintiffs' employment, the misleading actions and misrepresentations leading up to that termination, and the contrived pre-employment process by Defendants constituted discharge, suspension, expulsion, and discrimination within the terms of ERISA § 510 brought about by the use of fraud to restrain, coerce and/or intimidate criminally prohibited by § 511. In so acting

17

unilaterally and while BNSF and RTS were contractually bound to do otherwise, all of the Defendants have acted against putative Plaintiffs:

>    (a)     for exercising rights to which they were entitled under the Teamsters contracts, namely, the making of medical and hospital claims by themselves and their eligible dependents, taking lengthy paid vacations, taking paid sick-leaves and taking early retirement and disability retirement pensions (prohibited by the "anti-retaliation" clause of § 510); and,

>    (b)     to interfere with the attainment of rights to which they became or might have become entitled such as a newly enhanced form of early retirement provided under the Teamsters multiemployer plan; disability retirement; regular retirement at higher benefit levels; health insurance coverage and medical and hospital treatments for injuries and illnesses by themselves or their eligible dependents; and other welfare benefits such as future vacation pay; future sick-leave pay; paid holidays and paid personal-leave days (prohibited by the "anti-attainment" clause of § 510);

while BNSF continued to enjoy the benefits of the stable, experienced and productive workforce performing its intermodal work.

44.     As a direct and proximate result of all of the Defendants' aforesaid tortuous actions in violation of 29 U.S.C. §1140 and under circumstances that implicate the criminal prohibition of § 1141, the members of putative Plaintiff

18

Teamsters Union Local 705 suffered the losses complained of above by reason of which they are entitled to recover of the Defendants all damages permitted by law.

45.     These actions of Defendants were willful, wanton, intentional, oppressive and outrageous, justifying the imposition of punitive damages in an amount sufficient to deter Defendants and others from like conduct in the future in that they violated the criminal prohibition against such conduct set forth in ERISA § 511, 29 U.S.C. § 1141.

**Second Claim for Relief**
**(civil conspiracy to violate ERISA rights)**

1-45. Plaintiffs, individually, restate all allegations above as paragraphs 1 through 45 of this second claim for relief directly and by way of reference as if fully pled.

46.     The foregoing acts of the Defendants evidence a common plan or scheme to interfere with, frustrate, discriminate, limit, or deny to Plaintiffs their full rights to which the Plaintiffs have and would have become entitled to under the ERISA pension and welfare plans adopted under collective bargaining agreements, as guaranteed by ERISA and federal law. All this was done for the economic benefit of the Defendants. Namely, Defendants conspired to deprive Plaintiffs of benefits earned or to be earned under the existing pension, health and welfare plans by firing them and replacing them with workers compensated at lower rates and given lesser pension, health and welfare benefits.

### Prayer for Relief

Wherefore, Plaintiffs, individually, and on behalf of all putative class members pray for judgment in their favor and against the Defendants, and for the following relief:

A.     For compensatory damages including front pay, back pay, lost plan benefits, lost employment income, lost Railroad Retirement Board contributions, and mental anguish;

B.     Where feasible, as for those Teamsters Local Union 705 members who have not since retired, reinstatement in lieu of front pay;

C.     For the actual value of Plaintiffs' attorneys' fees appropriately enhanced by a lodestar factor of at least three;

D.     For other appropriate equitable relief as required to make the putative Plaintiffs whole including full restitution and disgorgement by Defendants of all profits acquired or earnings gained through their conduct in violation of §§ 510 and 511 of ERISA;

E.     For attorneys' fees under 29 U.S.C. § 1132 for enforcement of ERISA rights;

F.     For punitive damages in an amount to be determined;

G.     For prejudgment interest;

H.     For their costs herein;

I.     For an award of such other relief in law and equity to which Plaintiffs may be entitled, and;

J.     For an order enjoining Defendants from continuing their wrongful conduct.

Dated:  January 18, 2011                    Respectfully submitted,


                                            s/Nicholas C. Kefalos____
                                            Attorney for Plaintiffs

Nicholas C. Kefalos, IL ARDC no. 6270051
VERNOR MORAN, LLC
27 North Wacker Drive, Suite 2000
Chicago, Illinois 60606-2800
Ph: (312) 264-4460
Fax: (312) 264-4461

nkefalos@vernormoran.com

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all other similarly situated putative

class members, hereby demand trial of their claims by jury to the extent authorized

by law.

Dated: January 18, 2011                     Respectfully submitted,


                                            s/Nicholas C. Kefalos___
                                            Attorney for Plaintiffs
Nicholas C. Kefalos, IL ARDC no. 6270051
VERNOR MORAN, LLC
27 North Wacker Drive, Suite 2000
Chicago, Illinois 60606-2800
Ph: (312) 264-4460
Fax: (312) 264-4461

nkefalos@vernormoran.com

21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| TEAMSTERS LOCAL UNION 705 | ) |
| | ) |
| -and- | ) |
| | ) |
| JOHNNY R. THOMAS, JAMES J. KANE, | ) |
| FELIPE GONZALEZ, JOSE A. MORALES, | ) |
| RICHARD W. KASSL, and | ) Judge Der-Yeghiayan |
| SANTOS M. MARINEZ, all in addition to or | ) |
| in the alternative to TEAMSTERS | ) |
| LOCAL UNION 705, all individuals being | ) |
| members of said union, for themselves, and as | ) |
| representatives of the affected class of persons | ) |
| who are members of TEAMSTERS LOCAL UNION 705, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -v- | ) |
| | ) |
| BURLINGTON NORTHERN SANTA FE, LLC, | ) |
| a Delaware limited liability company, | ) |
| BURLINGTON NORTHERN SANTA FE | ) Case No. 10-cv-7378 |
| CORPORATION, BNSF RAILWAY COMPANY, | ) |
| Delaware corporations, and SANTA FE TERMINAL | ) |
| SERVICES, INC., a Delaware corporation, | ) |
| | ) |
| -and- | ) |
| | ) |
| BERKSHIRE HATHAWAY, INC., a Delaware corporation, | ) |
| | ) |
| -and- | ) |
| | ) |
| RAIL TERMINAL SERVICES, INC., a Delaware | ) |
| corporation, RAIL MANAGEMENT SERVICES, LLC, | ) |
| a Washington corporation, CARRIX, INC., a Washington | ) |
| corporation, | ) FILED VIA E-FILING |
| | ) |
| -and- | ) |
| | ) |
| TRANSPORTATION COMMUNICATIONS | ) |
| INTERNATIONAL UNION, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' COMBINED RESPONSE TO ALL DEFENDANTS'
MOTIONS TO DISMISS THE AMENDED COMPLAINT**

22

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| **I.** **Introduction** | 1-3 |
| **II.** **Standard of Review** | 3 |
| *Bell Atlantic Corp. v. Twombly* 550 U.S. 544, 547 (2007) | 3 |
| *Tamayao v. Blagojevich* 526 F.3d 1074, 1084 | 3 |
| *Abcarian v. McDonald* 617 F.3d 931, 933 (7th Cir.2010). | 3 |
| **III.** **Facts And Inferences To Be Drawn From The Amended Complaint** | 3-6 |
| *Travel All Over The World v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429-30 (7th Cir. 1996). | 3-4 |
| 45 U.S.C. §151 First, §152 First, Fourth | 5, note 6 |
| 45 U.S.C. §231a | 6, note 7 |
| 45 U.S.C. §231(a)(1) | 7, note 7 |
| **IV.** **ERISA §510 Liability Does Not Depend On An "Employment" Relationship** | 6-7 |
| 29 U.S.C. §1140 (ERISA §510) | 6 |
| 29 U.S.C. §1002(9) | 7 |
| *Warner v. Buck Creek Nursery* 149 F. Supp. 2d 246, 251, 258 (D. W.V. 2001) | 7 |
| *Tingey v. Pixley-Richards* 953 F.2d 1124, 1132 n.4 (9th Cir. 1992) | 7 |
| *Inter-Modal Rail Employees Assoc. v. The Atchison, Topeka and Santa Fe Ry. Co.* 80 F.3d 348, n.5 (9th Cir. 1996), *aff'd*, 520 U.S. 510 (1997) | 7 |
| *Feinberg v. RM Acquisition, LLC* 629 F.3d 671, 675 (7th Cir. 2011) | 8 |
| *Mattei v. Mattei* 126 F.3d 794, 801-02 (6th Cir. 1997) | 8 |
| **V.** **Local 705 Has Associational Standing to Represent Its Membership For Violations Of Their Right To ERISA Benefits** | 8-11 |

| Section | Page |
|---|---|
| *International Union v. Brock* | |
| 477 U.S. 274 (1986) | 9, 10 |
| *So. Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois* | |
| 326 F.3d 919, 922 (7th Cir. 2003) | 9,10,11 |
| *Operating Engineers Local 148 v. Illinois Dept. of Employment Security* | |
| 215 Ill. 2d 37 (2005) | 9, 10 |
| *Hunt v. Washington State Apple Advertising Comm'n* | |
| 432 U.S. 333, 343 (1977) | 9 |
| **VI.    The Related Corporate Defendants<br>Can Be Held Liable For Their "Direct Participation"<br>In the Scheme To Deprive Plaintiffs Their Rights** | 11-13 |
| *Forsythe v. Clark USA, Inc.* | |
| 224 Ill. 2d 274 (2007) | 12 |
| *Esmark Inc. v. N.L.R.B.* | |
| 887 F.2d 739 (7th Cir. 1989) | 12 |
| *Browning v. AT&T Corp.* | |
| 682 F. Supp.2d. 832, 840 (N.D.Ill.2009) | 13 |
| *Doyle v. Shlensky* | |
| 120 Ill.App.3d 807, 458 N.E.2d 1120, 1131 (Ill.App.Ct.1988) | 13 |
| **VII.    Plaintiffs Have Adequately Pled That Defendants<br>Conspired To Deprive Them Of Their ERISA Rights** | 13-16 |
| *Adcock v. Brakegate, Ltd.* | 14 |
| 164 Ill. 2d 54, 62 (1994) | |
| **VIII.   Federal Rule of Civil Procedure 9(b)<br>Does Not Require Plaintiffs To Plead "Intent"** | 16 |
| Federal Rule of Civil Procedure 9(b) | 16 |
| *Heimann v. National Elevator Industry Pension Fund* | |
| 187 F.3d 493, 509 (5th Cir. 1999) | 17 |
| *Tingey v. Pixley-Richards* | |
| 953 F.2d 1124, 1132 n.4 (9th Cir. 1992) | 19 |
| **Conclusion** | 19 |

25

## PLAINTIFFS' COMBINED RESPONSE TO ALL DEFENDANTS'
## MOTIONS TO DISMISS THE AMENDED COMPLAINT

The plaintiffs, TEAMSTERS LOCAL UNION 705 and JOHNNY R. THOMAS, JAMES

J. KANE, FELIPE GONZALEZ, JOSE A. MORALES, RICHARD W. KASSL and SANTOS

M. MARINEZ, for themselves and as representatives of the affected class of persons,

("plaintiffs"), through their attorneys Nicholas Kefalos and Michael Palermo, submit the

following, Plaintiffs' Combined Response to All Defendants' Motion to Dismiss the Amended

Complaint, ("Combined Response" or "Response"):

### I. Introduction

The defendants have all moved this Court to dismiss the Amended Complaint under Fed.

R. Civ. P. 12(b)(6). Plaintiffs make this Combined Response instead of filing four separate

Responses to each of the defendants' filed motions, (Document #'s 14, 17, 21, and 31), inasmuch

as the defendants have presented variations on the same grounds for dismissal. Because the

motions of the "Railway Defendants[1]" cover all issues and the remaining defendants in one way

or another have made some of the same arguments, Plaintiffs' Response will focus primarily on

the Railway Defendants' motion, and make special note where the other defendants have made a

variant of the same argument, and address those variations as necessary.

The Railway Defendants have asked this Court to dismiss the Amended Complaint based

on (1) a misreading of ERISA §510;[2] (2) Local 705's lack of standing to represent its own

membership; (3) that the related corporate entities cannot be liable even if they engaged in

---

[1]The Railway Defendants are BNSF Railway Company, Burlington Northern Santa Fe LLC, Burlington Northern Santa Fe Corporation, and Santa Fe Terminal Services, Inc. [Document #15].

[2]The Transportation Communications International Union ("TCIU") joins in this issue. [Document # 34, p.5].

1

26

wrongful conduct as alleged;[3] (4) lack of pleading into their "specific intent" defense, which they presumably intend to aver sometime in the future;[4] and (5) failure to properly plead a conspiracy among the defendants.[5]

First, the Railway Defendants would have this Court believe that only an "employer" in the strictest sense can be liable for interfering with an employee's ERISA §510 rights, when in fact §510 imposes liability on any "person," the word "employer" does not appear in §510, and the courts routinely allow suits against non-employers for §510 violations.

Next, Local 705 has "associational standing" under a long line of United States, Seventh Circuit, and Illinois Supreme Court cases allowing labor unions to represent aggrieved members in a variety of circumstances, including under ERISA. As to the liability of the related corporate entities, the Illinois Supreme Court and the Seventh Circuit have recognized that a corporate "parent" can be liable for the acts of a subsidiary where the parent undertook or directed the wrongful conduct on its own accord. Additionally, the Railway Defendants argue that the plaintiffs have not pled a "specific intent" to violate their rights. But Fed. R. Civ. P. 9(b) does not require pleading state of mind, and various courts have held this not necessary.

Finally, the plaintiffs have adequately pled a cause of action for a conspiracy among all the defendants to violate the plaintiffs' ERISA rights because the plaintiffs have alleged that the defendants schemed together to get Local 705 (on behalf of the plaintiffs) to agree to wage and benefit concessions in excess of $1,000,000, while months earlier the railroad had entered into a "sweetheart" agreement with TCIU, so that the Railway Defendants could pick one contract or

---

[3]Berkshire Hathaway Inc. [Document # 18] and Rail Terminal Services, Inc. [Document #22, p.11] join in this issue.

[4]TCIU [Doc. #34, p.7] and Rail Terminal Services, Inc. [Doc. #22, p.7] join in this issue.

[5]Rail Terminal Services, Inc. [Document #22, p.9] and TCIU [Doc. #34, p.8] join in this issue.

2

the other, depending on which met its "economic" goals. In other words, the defendants schemed, conspired, and planned to deprive and deny plaintiffs of their ERISA rights.

### III. Standard of Review

Defendants misapprehend and misconstrue Fed. R. Civ. P. 12(b)(6). Namely, defendants misunderstand the distinction between allegations pled in a complaint as opposed to showing or proving allegations at trial. Defendants would have this Court hold plaintiffs to prove via their pleading that plaintiffs are entitled to relief. But that is not the legal standard. To the contrary, a complaint only need "contain enough facts to state a claim for relief that is plausible on its face" with sufficient facts to raise a plaintiff's right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). It is a low standard.

Indeed, to survive a Rule 12(b)(6) motion, a complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has the right to relief, raising that plausibility above a speculative level." *Tamayao v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir.2008)(internal quotation marks omitted).

Applying this very deferential standard, plaintiffs have adequately pled their claims against all of the defendants for the reasons that follow. This is true, especially in light of the fact that the court must "take the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in [plaintiff's] favor from those allegations." *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir.2010).

### III. Facts And Inferences To Be Drawn From The Amended Complaint

The Court should accept the following facts and inferences as true, for purposes of ruling

3

on a Rule 12(b)(6) motion. *Travel All Over The World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429-30 (7th Cir. 1996).

For over 60 years, the Teamsters, their membership, and the Railway Defendants have had a special relationship at Corwith Yard on the South Side of Chicago. (Amend. Compl. ¶¶4, 19, 20, 39, 40). Together with the Railway Defendants, the Teamsters created a pension and other ERISA protected benefits for the workers at Corwith. (Amend. Compl. ¶¶20, 22 - 25, 39) Generations of families - sons, fathers, grandfathers - have worked at Corwith, been members of the Teamsters, and drawn Teamster pensions and benefits. Through a series of intermediaries that ran Corwith Yard, last of which was Railway Terminal Services ("RTS"), which employed the plaintiffs as the scheme developed, (as described in the Amended Complaint), the Railway Defendants paid into the Teamster benefit plans for years. Prior to the Railway defendants' canceling RTS' contract, the individual plaintiffs had anticipated and accrued credits towards the Teamster pension plan that had been in effect for these 60 years. (Amend. Compl. ¶¶5-10) In addition to the Teamsters' pension, the putative "employer" (RTS and its predecessors, such as named defendant Santa Fe Terminal Services) had been paying into Social Security on behalf of the plaintiffs, who had been accumulating credit toward that benefit. (Amend. Compl. ¶27)

The scheme as alleged in the Amended Complaint involved RTS and the other defendants inducing the Teamsters to give over $1,000,000 in wage, health, pension and welfare concessions to the Railway Defendants and RTS by July 2010 (despite having a contract through 2013). (Amend. Compl. ¶¶31, 40, 41) Unbeknownst to the Teamsters at the time, however, the Railway Defendants had already inked a contract with TCIU to become the individual plaintiffs' "paper union" at Corwith, on June 16, 2010 – at the least –one month prior to extracting

4

concessions from the Teamsters.[6] (Amend. Compl. ¶¶30)

Through this scheme, the Railway Defendants - working together with TCIU and RTS - interfered with plaintiffs' rights to the Teamsters' pension and other ERISA protected benefits, by playing the Teamsters off of TCIU to see which Union would give more concessions. On June 16, 2010, the Railway Defendants knew with certainty what the terms of a TCIU agreement would look like, and thus knew the extent to which they could demand concessions from the Teamsters. They could then make the decision whether to retain RTS and the Teamsters, or go with TCIU. Ultimately, the Railway Defendants canceled RTS' contract, and went with the pre-negotiated TCIU contract. (Amend. Compl. ¶26, 27) Indeed, the TCIU agreement is special to Corwith: it contains vastly inferior wages, benefits, job protections, than the Teamsters' contract, and does not even come close to the TCIU national agreement for wage or benefit increases for TCIU workers in other rail yards. (Amend. Compl. ¶¶29 - 33).

The Railway Defendants were able to stop paying into the Teamster pension plan, stop paying into the Teamster welfare and other benefit plans, stop paying into Social Security; and now they only have to pay into the Railway pension (inasmuch as TCIU has no employer funded pension benefit under its Collective Bargaining Agreement). (Amend. Compl. ¶¶27, 32, 33). Furthermore, the plaintiffs, even those who had worked at Corwith for years, were now made "probationary" employees of the Railway Defendants for nine months, subject to discharge for no reason, with no grievance rights, with a loss of all seniority, a loss of their Teamster health

---

[6]Under the Railway Labor Act, 45 U.S.C. §151 First, §152 First, Fourth, bargaining and agreements with a railroad for a particular class of employees is done system-wide, unless there is a non-captive entity (like, for example, RTS or Santa Fe Terminal Services, as was the case here) running the yard. Then bargaining and agreements can be done locally. At Corwith, the Railway Defendants ran the yard (at one time) via Santa Fe Terminal Services or (at another time) through another servant, such as RTS.

5

insurance, a loss of their Social Security credits, and with a reduction in pay[7]. (Amend. Compl. ¶¶5 - 10, 27, 28).

The plaintiffs have sued these defendants, asking the Court to find them liable for violating their rights as guaranteed by ERISA, interfering with their mutual association with the Teamsters, and are asking for compensatory damages for front pay, back pay, lost income, loss of anticipated ERISA and other pension benefits; and for punitive damages and other equitable relief.

## IV.  ERISA §510 Liability Does Not Depend On An "Employment" Relationship

The Railway Defendants and TCIU argue that because they were not the direct "employers" of the individual plaintiffs while co-defendant RTS operated Corwith Yard, they should not now be held liable for their role in this scheme to terminate RTS and install TCIU as the company union.

This argument fails for the simple reason that ERISA §510 does not limit liability to "employers" but rather, its broad provisions encompass all "persons" who "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the Plan, this subchapter ..." 29 U.S.C. §1140. Congress showed its intent to have §510 apply broadly, by defining a "person" as "an individual, partnership, joint venture, corporation,

---

[7] Under the Railroad Retirement Act, 45 U.S.C. §231a, an individual is vested in the Railroad pension after ten years of service to a qualified "employer." An "employer" under the RRA is an entity that is either a carrier by railroad that also operates a rail yard, or a captive entity of a railroad which operates a rail yard. 45 U.S.C. §231(a)(1). Otherwise, if the entity that operates the rail yard is not "directly or indirectly owned or controlled by" a carrier by railroad, that entity contributes to Social Security rather than the Railroad pension. Thus by transitioning employment from an allegedly non-captive entity, RTS, to employment with the Railroad, the workers stopped accruing Social Security benefits and started, from scratch, accruing Railroad retirement benefits. So in this case, if the Corwith workers make it past their 9 month probationary period---per the TCIU contract (for jobs they have been doing satisfactorily for years already as a Teamster) then they will have to work an additional 10 years to get RRA benefits. Great deal!  They lose their ERISA pension rights and now have to work an additional 10 years to get RRA benefits.

6

31

mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. §1002(9). The word "employer" isn't even in this section.

Indeed, the Courts have consistently allowed "interference" actions against non-employers since ERISA §510 was enacted. For example, courts have allowed claims against a supervisor, individually, for trying to unduly influence an injured worker not to make use of his health/disability insurance (*Warner v. Buck Creek Nursery*, 149 F. Supp. 2d 246, 251, 258 (D. W.V. 2001)); against an insurer who forces an employer to fire an employee for exercising his rights under a plan (*Tingey v. Pixley-Richards*, 953 F.2d 1124, 1132 n.4 (9th Cir. 1992)); and, most strikingly, against two of the defendants here ( BNSF, and Santa Fe Terminal Services, Inc.) who conspired together to interfere with ERISA protected rights of the yard workers (*Inter-Modal Rail Employees Assoc. v. The Atchison, Topeka and Santa Fe Ry. Co.*, 80 F.3d 348, n.5 (9th Cir. 1996), *aff'd*, 520 U.S. 510 (1997)).

Factually, the instant case mirrors that in *Inter-Modal*. In that case, BNSF (formerly Atchison Topeka & Santa Fe Ry., see note 7 of Doc. #15) had farmed out the yard operating functions to a third-party entity, coincidentally one of the same defendants at bar (Santa Fe Terminal Services, Inc.). The plaintiffs alleged that the Santa Fe entities, along with the new yard operator, had conspired to deprive them of their pension and welfare benefits through this scheme, which resulted in the discharge of many of the plaintiffs. The Ninth Circuit reversed the District Court's dismissal under Fed. R. Civ. P. 12(b)(6), ruling that non-employers *and* subsequent employers can be held liable for §510 violations under the plaintiffs' conspiracy theory[8]. *Id.*

The only difference here is that the Railway Defendants terminated the yard operator

---

[8]The Railway Defendants tell the Court that "no court has adopted the federal common law conspiracy theory that plaintiffs espouse" when in fact, the *Inter-Modal* cases do just that, and against these very same defendants no less. 80 F.3d at n. 5. Railway Defendants Motion, n. 10 [Doc. #15].

RTS and undertook to operate the yard itself; rather than placing a sham intermediary between itself and the employees. (Amend. Compl. ¶¶26, 27). In either case, Santa Fe used the *transaction* of either contracting out the yard work (*Inter-Modal*) or taking it back in-house to further the scheme of interfering with ERISA protected rights: *to wit*, a worker, like plaintiff James Kane, who worked years to accrue points toward vesting in the Teamsters' pension, for example, now finds himself without a pension and without any accrued rights towards that pension. He has nothing, he has to start from scratch, while the defendants have no further Teamster pension contribution liability, and have shielded themselves from withdrawal liability through the use of RTS as an intermediary. He has also lost his social security benefit because, if he stays with the railroad, he starts over with the RRA pension.

And by systematically and periodically switching back and forth between sham intermediary yard operators, as was done here, and now operating the yard themselves; and "discharging" and "rehiring" the same workers (Amend. Compl. ¶¶27 - 29); and by playing the local union off of a national union, here, TCIU as a willing participant, the Railway Defendants have shed themselves of anticipated ERISA liabilities.

Ultimately, all of these defendants' argument must fail because the term "employer" just is not in the statute, and an employer/employee relationship is not a pre-requisite to liability under §510. If there's any residual doubt that a non-employer may be sued for interfering with a person's ERISA rights, the Seventh Circuit just this year put the final nail in the coffin on that argument. *Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675 (7th Cir. 2011); *see also, Mattei v. Mattei*, 126 F.3d 794, 801-02 (6th Cir. 1997) (cataloging, and rejecting, cases that limit liability to the employer/employee relationship).

For these reasons, this Court must reject the Railway Defendants' and TCIU's argument

8

33

that they can have no liability under ERISA §510 because they were not the "employer" of the individual plaintiffs, and this Court must therefore deny their Motion on that basis.

## V. Local 705 Has Associational Standing to Represent Its Membership for Violations of their Right to ERISA Benefits

Teamsters Local 705 has "associational standing" to represent its membership, despite the Railway Defendants' assertion to the contrary, because as a labor union, the membership authorized and in fact, relied on it, to protect their "income and benefits" in dealing with the Defendants. The United States Supreme Court has long recognized the right of a labor union to assert claims for the protection of "benefits" on behalf of the union's membership. *International Union v. Brock*, 477 U.S. 274 (1986). More to the point, the Seventh Circuit has also explicitly held that a union has associational standing under §1132 of ERISA and Fed R. Civ. P. 23.2: "we do not think that by confining the right to sue under section 1132(a)(1) to plan participants and beneficiaries Congress intended to prevent unions from suing on behalf of participants." *So. Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919, 922 (2003).

The union only need show:

> "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested require the individual members in the lawsuit" *International Union*, 477 U.S. at 282, *citing, Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Here, the members of Local 705 would have standing to assert the fraud perpetrated on them which interfered with their ERISA and other rights. Tellingly, all of those ERISA rights are *derived from* their membership in Local 705 - for example, the pension plan is established through a collective bargaining agreement between RTS and Local 705.

Second, no union function (other than collective bargaining) could be more "germane to

34

the organization's purpose" than protecting the rights of its members who fall victim to the wrongful acts of their employers. Certainly the Illinois Supreme Court thought so in *Operating Engineers Local 148 v. Illinois Dept. of Employment Security* 215 Ill. 2d 37 (2005) (union had standing to represent members in claim for unemployment benefits, who were denied such benefits during a strike).

One of the factors relied on by the Illinois Supreme Court was that the union was the agent for the members for "the purpose of furthering their work-related interests, *particularly income and benefits*" and that the union "sought to protect the interests of its members to income *and benefits*. Such a goal could not be more germane to the purpose of the union." *Local 148*, 215 Ill. 2d at 51 - 52 (italics added). The U.S. Supreme Court, ruling in favor of finding associational standing, reasoned that unions, "can draw upon a pre-existing reservoir or expertise and capital," and that the doctrine "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they often share with others ... to permit the association or corporation in a single case to vindicate the interests of all." *International Union*, 477 U.S. at 289 (internal quotations omitted).

Significantly, both *International Union* and *Local 148* dealt with legislatively created "benefits," whereas the case before this Court deals with benefits *created by the union itself*. There is a closer connection of the benefits here *vis-à-vis* the "association" and its membership than existed in *International Union* and *Local 148*.

There is no difference between a union's seeking to protect unemployment benefits of the membership, and a union's seeking to protect ERISA benefits of the membership, as here. Benefits are benefits, no matter what their source. It would give an absurd result to tell the membership that Local 705 can represent them to establish the pension plan and other benefits in

10

35

the first place, i.e., bargain to establish the right to ERISA benefits, and maintain that pension through successive employers over 60+ years, but that Local 705 had no "standing" to defend them when their rights under those same plans are threatened. Such a goal as protecting the ERISA rights of its members could not be more germane to the purpose of Local 705.

Finally, the participation of the individual claimants is not necessary for a full determination of the issues. The overarching issues of this case are whether the defendants, individually and in conspiracy, interfered with the memberships' ERISA guaranteed rights. Although some of the members' damages may need individual calculation (like in *Illinois Carpenters Welfare Fund*), such a determination is not central to whether liability is imposed.

While the Railway Defendants claim that Local 705 lacks standing under ERISA's enforcement mechanism, 29 U.S.C. §1132(a)(1) because Local 705 is not a "participant or beneficiary", this ignores the fact that Local 705 does not act here solely on its own behalf, but on behalf of its entire membership at Corwith who have been aggrieved by the Railway Defendants' conduct. That's exactly why the courts created the doctrine of "associational standing" - to allow an appropriate association to represent its constituent members' rights in accordance with the organization's purpose.

This Court must therefore find that Local 705 has associational standing to represent its aggrieved membership in this action.

### VI. The Related Corporate Defendants Can Be Held Liable For Their "Direct Participation" in the Scheme To Deprive Plaintiffs Their Rights

The "related" corporate defendants (Burlington Northern Santa Fe LLC, Burlington Northern Santa Fe Corporation, and Santa Fe Terminal Services, Inc.) argue that they can have no liability here for their own conduct in interfering with Plaintiffs' ERISA guaranteed rights, because "allegations against corporate subsidiaries, without more, fail to state a claim against the

11

parent." (Railway Defendants' Memo. p. 14 [Doc. #15]) However, the allegations in the Amended Complaint are not against a "subsidiary" but rather against all the defendants for their *own* "direct participation" in this scheme[9].

Both the Illinois Supreme Court and the Seventh Circuit have recognized that a corporate "parent" can be liable for the acts of a subsidiary, if the parent directly participated in the wrongful conduct. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274 (2007); *Esmark Inc. v. N.L.R.B.*, 887 F.2d 739 (7th Cir. 1989). Thus, a "parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark*, 887 F.2d at 757. Indeed, where the parent uses its "ownership interest to command rather than merely cajole" courts should impose liability. *Esmark, id.* Courts have held parent companies liable under "direct participation" liability for "patent or copyright infringement, false advertising, fraud, conversion ..." *Esmark*, 887 F.2d at 756 (footnotes omitted, internal quotations omitted).

Here, the plaintiffs have alleged that the Railway defendants knew of the plaintiffs' employment relationship because they were employed under a written contract which fixed the terms of their employment (Amend. Compl. ¶40); and in 18 pages of allegations, that the Railway Defendants "decided to intentionally interfere with Plaintiffs' employment relationship ... and their legitimate expectancy of continued direct employment ... for the purpose of depriving Plaintiffs of or reducing the levels of the ERISA-protected 'fringe' benefits of their employment." (Amend. Compl. ¶41). Finally, Plaintiffs have alleged that "the Defendants" acted against Plaintiffs for exercising their ERISA rights; and that the Plaintiffs suffered their

---

[9]Note that there are no allegations that these "parent" defendants are, in fact, "parents" to BNSF Railway Company - it is actually alleged that in one instance Santa Fe Terminal Services, Inc. is a subsidiary to BNSF Railway Company (Amend. Compl. ¶13). Thus these Defendants' assertion that they are, in fact, the "parent" is without support in the record. Response to this argument is made, with objection, to inform the court. Plaintiffs move to strike this portion of the Railway Defendants' argument as beyond the scope of Rule 12(b)(6).

12

37

loss "as a direct and proximate result *of all of the Defendants'* aforesaid tortuous actions." (Amend. Compl. ¶43-44)

Plaintiffs are not seeking to "pierce" any corporate veil, but rather, are seeking to hold a wrongdoer directly liable for its own conduct. For their part, the Railway Defendants admit that ownership of Corwith was joint amongst them - the "parent-subsidiary" relationship, if any, intentionally blurred. (Railway Defendants' Motion, p. 2 [Doc. # 15]). As such, the Plaintiffs have adequately pled a claim for relief against all of the "parent" defendants under the notice pleading standards of Fed. R. Civ. P. 8(a).

Notwithstanding the fact that plaintiffs are seeking to hold each of the defendants accountable for each of their own intentional bad conduct, *arguendo*, even if this Court were to entertain the RTS, RMS, Carrix and TCIU defendants arguments that they were just following orders of the Railway defendants, at the very least, a master-servant relationship cannot be decided on a Rule 12(b)(6) motion because whether a defendant was acting as one's agent under Illinois law is a factual matter. *Browning v. AT&T Corp.*, 682 F. Supp.2d. 832, 840 (N.D.Ill.2009); *see also, Doyle v. Shlensky*, 120 Ill.App.3d 807, 458 N.E.2d 1120, 1131 (Ill.App.Ct.1988)(whether an agency relationship exists is generally a question of fact).

Based on all of these reasons, this Court must deny the Railway Defendants' and Rail Terminal Services' 12(b)(6) motions on these grounds.

### VII. Plaintiffs Have Adequately Pled that Defendants Conspired to Deprive Them of their ERISA Rights

The Railway Defendants, RTS, and TCIU next argue that the plaintiffs cannot maintain a conspiracy claim because the plaintiffs do not allege how any defendant entered into a conspiratorial agreement with any other defendant, or specific acts taken in furtherance of the conspiracy. This ignores most of the Amended Complaint, however, which more than

13

adequately sets out each of the defendants' role in this scheme.

Under Illinois law, a civil conspiracy is simply, "two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994). A co-conspirator who knows of the "general objectives" of the conspiracy and accepts the benefit of the tortuous act will be held liable as well. *Adcock*, 164 Ill. 2d at 64.

### 1.    The Railway Defendants

Here, the plaintiffs have pled all elements of a civil conspiracy among the defendants. First, plaintiffs have alleged that two or more persons took part in the conspiracy: the claim arises because the Railway Defendants, with full knowledge that RTS and Local 705 had a collective bargaining relationship, entered into an agreement with TCIU for TCIU to represent the same employees who at the time were already represented by Local 705. (Amend. Compl. ¶30, 31, 27). This was done *long before* the Railway Defendants terminated the contract with RTS: *to wit*, the Railway Defendants - TCIU contract was made in June 2010, but the Railway Defendants had not terminated RTS at the time of making that contract and thus Local 705 was the lawful bargaining representative of all the workers at Corwith; the Railway Defendants still had not terminated RTS until well *after* Local 705 had made concessions on its contract, terminating the Local 705 sometime in January 2011. (Amend. Compl. ¶26, 30, 31).

The Railway Defendants were playing the two unions' concessions off of each other, with the TCIU "sweetheart" contract in its pocket just in case. This is the "unlawful purpose" here, bargaining with two separate, distinct unions covering the same exact class of members at the same time---i.e., the Railway Defendants and RTS were bargaining with TCIU and the Teamsters over the benefits of workers that only the Teamsters could lawfully represent at the

14

39

time, inasmuch as this rigged "bargaining" was done with the intent of interfering with the plaintiffs' ERISA protected rights, in violation of §510, which unlawful activities also interfered with the individual plaintiffs association with the Teamsters. Under either the TCIU agreement, which by its terms applies only to Corwith or the "renegotiated" Local 705 agreement, the plaintiffs suffered a complete loss or a drastic reduction in their ERISA benefits.

### 2.    Transportation Communications International Union

Notably, TCIU took part in the scheme. First, when TCIU and the Railway Defendants entered into negotiations and their labor agreement, TCIU was decidedly *not* the authorized representative of the workers at Corwith: Local 705 was. TCIU had no business, under the Railway Labor Act, or otherwise, negotiating a sweetheart contract with the Railway, which contract only pertained to Corwith. Curiously, TCIU negotiated a contract for people it did not represent and excluded those members from the national contract TCIU had under the Railroad Act. From the get-go, TCIU had no legal right to negotiate the contract it made: it was negotiating wages and benefits for workers who had not authorized it to do so.

Next, the Court can easily infer that TCIU, as the system-wide bargaining representative of the class of employees represented by Local 705 at Corwith, knew that Local 705 and RTS had an existing agreement. Furthermore, because the TCIU contract with the Railway Defendants is specific to Corwith (Amend. Compl. ¶29), the Court can infer that TCIU "specifically intended" to undercut the RTS - Local 705 agreement. For example, the BNSF-TCIU contract has no mandatory employer pension obligation; no grievance procedure under certain circumstances, including for example, no grievance procedures for 9 month probationary period; no nationwide wage increases. TCIU knew that it was negotiating a contract that the Railway Defendants, through RTS, would play against the Local 705 concessions.

Subsequent to the Railway Defendants' terminating RTS' agreement (and with it, Local 705), TCIU by operation of law became the bargaining agent at Corwith, with its sweetheart deal in hand. Under *Adcock*, TCIU can be held liable as a co-conspirator because it (a) knew of the general objectives of the Railway Defendants' scheme (to play the concessions off against one another, violate the Railway Labor Act), and (b) accepted the benefit of the scheme (TCIU is now the bargaining representative at Corwith) with more union dues paying members. TCIU, more than that, actively participated in the scheme, and profited by becoming the bargaining representative at Corwith.

### 3.    Rail Terminal Services, Inc.

Rail Terminal Services, Inc., likewise took part in the conspiracy. The plaintiffs have alleged that RTS was a sham operator at Corwith, with the Railway making all management decisions, and controlling operations, through them as willing servants. (Amend. Compl. ¶¶17, 18). The plaintiffs further allege that RTS went along with the conspiracy by engaging Local 705 in "renegotiating" the labor agreement, under circumstances where the Railway Defendants already had the TCIU agreement in hand (Amend. Compl. ¶¶30, 31). RTS was a necessary and willing participant in the Railway's scheme, and therefore part of the conspiracy.

Therefore, this Court must find that the plaintiffs have adequately pled a claim for a conspiracy among the defendants in Count II, and thus deny the Railway Defendants', TCIU's and Rail Terminal Services' Motion on this point.

### VIII.  Federal Rule of Civil Procedure 9(b) Does Not
### Require Plaintiffs To Plead "Intent"

The defendants finally argue that the plaintiffs have not pled a "specific intent" to violate their ERISA rights. Ignoring, for a minute, that the entire Complaint revolves around the Railway Defendants' scheme to terminate the 60 year Teamster pension plan, Federal Rule of

16

41

Civil Procedure 9(b) does not require the pleading of "intent", specific or otherwise: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." As the Fifth Circuit reasoned in an ERISA §510 case where the defendants argued that the Complaint did not allege "specific intent": "describing a state of mind with exactitude is inherently difficult and would lead to a complexity and prolixity in pleadings." *Heimann v. National Elevator Industry Pension Fund*, 187 F.3d 493, 509 (5th Cir. 1999) (reversing dismissal of plaintiffs' ERISA claim for failure to allege "specific intent"). More to the point, the Court reasoned that "the use of the term 'specific intent' or other ERISA terminology is not sacramental or necessary to the pleading of a cause of action" under §510. *Heimann*, 187 F.3d at 509.

### 1.    The Railway Defendants

Here, despite no requirement for the Plaintiffs to plead intent, the Court can nevertheless infer the Railway Defendants' "intent" to interfere with the Plaintiffs' ERISA expectancy from the allegations. The Railway Defendants and TCIU certainly did not "accidentally" or "negligently" enter into negotiations and a contract, knowing that RTS and Local 705 already had a contract in place; and the terms of the TCIU contract were not "accidentally" more favorable to the Railway Defendants than the existing RTS - Local 705 contract. These were specific acts undertaken by the Railway Defendants and TCIU, to achieve a specific goal: to reduce the Railway Defendants' pension and other labor costs through subterfuge, unfair dealing and conspiracy.

And although they further argue that they can have no "specific intent" absent a financial gain (which is alleged, by the way, Amend. Compl. ¶31, 32), that is simply not the law. ERISA §510 only requires an interference with a protected right, regardless of the motivation.

42

### 2.    Transportation Communications International Union

As to TCIU, again, their "intent" to interfere is alleged and can be inferred.  First, it is alleged that in mid-June 2010, TCIU and the Railway Defendants entered into a labor agreement that was specifically negotiated for and only for Corwith. (Amend. Compl. ¶29-33).  At the time, however, TCIU did not actually represent the workers at Corwith, because Local 705 was the sole representative of the Corwith workers through December 2010.  A lowball contract offer from TCIU under these circumstances would necessarily have interfered with Local 705's memberships' rights by undermining the terms of the existing labor agreement.  And TCIU would have known this.  Indeed, the TCIU contract contained all sorts of "sweeteners" that the Local 705 contract did not have:  the TCIU contract has no pension contribution duty; no health and welfare plan; no grievance rights under certain circumstances---notably no grievances allowed for probationary employees; and the TCIU contract expressly provided that national wage increases will not be applied at Corwith.

The "specific intent" of TCIU was to get the Corwith labor contract from Local 705 at all costs, by undercutting a pre-existing, long term contract that Local 705 has held for 60+ years at Corwith, even if the workers TCIU purportedly "represent" suffered the loss:  loss of wage increases, loss of health benefits, and ultimately, the loss of a 60+ year pension plan.  Indeed, TCIU entered into this agreement even though it put the workers at Corwith below the contract benefits that TCIU had under its national contract with the Railroads.

### 3.    Rail Terminal Services

Finally, the Amended Complaint also informs RTS of its "specific intent" to deprive the plaintiffs of their ERISA rights.   First, by terminating the plaintiffs, they *prima facie* "discharged" them under circumstances where the plaintiffs would necessarily lose their ERISA

43

rights, under §510. Next, the plaintiffs have, indeed, pled sufficient facts to show RTS' "intent." The plaintiffs allege that RTS was the sham operator at Corwith, with the Railway as the "true" entity running the show, making all management decisions there. As the Railway's "servant" at Corwith, RTS negotiated with Local 705 under the circumstances discussed above. When the Railway decided to take the sweetheart TCIU labor contract, instead of the Local 705 concessions, RTS' discharge of the individual plaintiffs, at the direction of their Railway masters, was done for the purpose of interfering with their ERISA rights, under §510. (Amend. Compl. ¶¶17, 18, 26-28)

RTS would have the plaintiffs plead facts against their affirmative defense to the claim, for example, "plaintiffs fail to allege any facts as to the possible motivation for RTS to entirely shut down a profitable operation," [Doc. #22, p. 8], but it's simply not the plaintiffs' burden to plead around affirmative defenses. There are no allegations in the Amended Complaint to show that RTS was profitable or not, and regardless of if it was, the plaintiffs have alleged that RTS did the Railway's bidding in discharging the individual plaintiffs for the purpose of interfering with their ERISA rights. *See, e.g., Tingey v. Pixley-Richards*, 953 F.2d 1124, 1132 n.4 (9th Cir. 1992)(claim of interference sufficient for ERISA violation).

Therefore, the Court must deny the Railway Defendants', TCIU's, and Rail Terminal Services, Inc.'s Motions to dismiss the Amended Complaint for failure to allege "specific intent"

## Conclusion

For all of the foregoing reasons the Plaintiffs request that the Court deny the defendants' Motions to Dismiss in their entirety.

Respectfully submitted,

44

TEAMSTERS LOCAL UNION 705 *et al.*

Dated: <u>July 29, 2011</u>          By: <u>/s/ Nicholas Kefalos</u>
                                          Attorney for Plaintiffs

| | |
|---|---|
| Nicholas C. Kefalos<br>VERNOR MORAN, LLC<br>27 N. Wacker Drive, Ste. 2000<br>Chicago, IL  60606-2800<br>Ph.:  (312) 264-4460<br>Fax:  (312) 264-4461<br><br>nkefalos@vernormoran.com | Michael Palermo<br>PALERMO LAW FIRM<br>105 W. Adams St., Ste. 2150<br>Chicago, IL  60603<br>Ph:  (312) 671-6453<br><br>palermo@palermolaw.com |

45