No. 11-3705

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

TEAMSTERS LOCAL UNION 705, *et al.*,                )
                                                     )
Plaintiffs-Appellants,                               )
                                                     )
-v-                                                  )
                                                     )
BURLINGTON NORTHERN SANTA FE, LLC,                   )
a Delaware limited liability company, *et al.*,      )
                                                     )
Defendants-Appellees.                                )

Appeal from the United States District Court
For the Northern District of Illinois
Case No. 11 C 7378
The Honorable Samuel Der-Yeghiayan

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

**VERNOR MORAN, LLC**
Nicholas C. Kefalos
IL ARDC # 6270051
27 North Wacker Drive, Suite 2000
Chicago, Illinois 60606-2800
(312) 264-4460
(312) 264-4461 (fax)
nkefalos@vernormoran.com
Attorneys for Plaintiffs-Appellants

## TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………….........ii

TABLE OF AUTHORITIES……………………………………………...iii-iv

ARGUMENT…………………………………………………..…………....1

I.    Prefatory Statement relative to BNSF and Corwith Yard………………….1

II.   ERISA Section 510 Liability Does Not Depend On An "Employment" Relationship…………………………………………………………….1

III.  There is no requirement to plead a specific intent to interfere with ERISA rights to state a claim under Section 510……………………………………

    1.    The Railway Defendants………………………………………………

    2.    Transportation Communications International Union…………………

    3.    Rail Terminal Services………………………………………………

IV.  The Related Corporate Defendants Can Be Held Liable For Their "Direct Participation" in the Scheme To Deprive Plaintiffs Their Rights…………

V.   Plaintiffs Adequately Pled that Defendants Conspired to Deprive Them of their ERISA Rights……………………………………………………

    1.    The Railway Defendants…………………………………………

    2.    Transportation Communications International Union……………

    3.    Rail Terminal Services, Inc……………………………………..

VI.  Local 705 Has Associational Standing to Represent Its Membership for Violations of their Right to ERISA Benefits……………………………

CONCLUSION……………………………………………………20-21

CERTIFICATE OF COMPLIANCE…………..……………………………21

CERTIFICATE OF SERVICE………………………………..……………22

## <u>TABLE OF AUTHORITIES</u>

<u>C</u>ASES

*Adcock v. Brakegate, Ltd.,*
        164 Ill. 2d 54, 62 (1994)..............................................................13

*Browning v. AT&T Corp.,*
        682 F. Supp.2d. 832, 840 (N.D.Ill.2009)...................................17

*Doyle v. Shlensky,*
        120 Ill.App.3d 807, 458 N.E.2d 1120, 1131 (Ill.App.Ct.1988)....................17

*Esmark Inc. v. N.L.R.B.*, 887 F.2d 739 (7th Cir. 1989).......................11

*Feinberg v. RM Acquisition, LLC,*
        629 F.3d 671, 675 (7th Cir. 2011)..........................................7

*Forsythe v. Clark USA, Inc.,* 224 Ill. 2d 274 (2007)...........................11

*Heimann v. National Elevator Industry Pension Fund,*
        187 F.3d 493, 509 (5th Cir. 1999)..........................................8

*Hunt v. Washington State Apple Advertising Comm'n,*
        432 U.S. 333, 343 (1977).................................................18

*Inter-Modal Rail Employees Assoc. v.*
        *The Atchison, Topeka and Santa Fe Ry. Co.,*
        80 F.3d 348, n.5 (9th Cir. 1996), *aff'd,* 520 U.S. 510 (1997))....................3

*International Union v. Brock,*
        477 U.S. 274 (1986)......................................................17

*Mattei v. Mattei*, 126 F.3d 794, 801-02 (6th Cir. 1997).........................7

*Nix v. Heddon,*
        149 U.S.304 (1893),........................................................1

*Operating Engineers Local 148 v.*
        *Illinois Dept. of Employment Security* 215 Ill. 2d 37 (2005)....................18

*So. Illinois Carpenters Welfare Fund v.*
        *Carpenters Welfare Fund of Illinois,*
        326 F.3d 919, 922 (7th Cir. 2003).........................................22

# TABLE OF AUTHORITIES
## (continued)

*Tingey v. Pixley-Richards*,
  953 F.2d 1124, 1132 n.4 (9th Cir. 1992)..........................................3, 10-11

*Warner v. Buck Creek Nursery*,
  149 F. Supp. 2d 246 (D. W.V. 2009)..................................................3


## FEDERAL STATUTES

29 U.S.C. §1002(9)................................................................................3
29 U.S.C. §1140.........................................................................2-3,7,8
45 U.S.C. §151, First, § 152, First, Fourth............................................4
45 U.S.C. §231(a)...............................................................................6
45 U.S.C. §231(a)(1)...........................................................................6


## STATE STATUTES

ACA § 1-4-115...................................................................................1
R.C. § 5.081......................................................................................1
T.C.A.§ 4-1-327.................................................................................1

## FEDERAL RULES

Federal Rule of Appellate Procedure § 32(a)(5)...................................21
Federal Rule of Appellate Procedure § 32(a)(6)...................................21
Federal Rule of Appellate Procedure § 32(a)(7)(B)..............................21
Federal Rule of Appellate Procedure § 32(a)(7)(B(iii)..........................21
Federal Rule of Appellate Procedure § 32(b)........................................21

## ARGUMENT

The Defendants quibble with the standard of review. They say that the Court must accept all the factual allegations in the complaint as true but that the Court doesn't have to believe what is stated.  (See e.g., Railway Defendants' Br. at p. 10.) The level of belief is predicated on each specific case and on the complexity of the claim. (Railway Defendants' Br. at p. 11.)  RTS appears to be beating the drum that every claim made out by Plaintiff are conclusory and, as such, the Court doesn't have to believe what is stated in the Complaint as true.  Oh well.  There goes notice pleading.  Sounds like fact pleading. Or like the legal contention over the tomato regarding what botanists have agreed upon is a fruit of a vine.  But asking a lawyer might get another answer.

Namely, is the tomato a vegetable, *Nix v. Heddon*, 149 U.S.304 (1893)(court finds unanimously that the tomato is a vegetable); a fruit,(R.C. § 5.081)(tomato is the official state fruit of Ohio); T.C.A.§ 4-1-327 (tomato is the official state fruit of Tennessee) or both a vegetable and a fruit, ACA § 1-4-115 (South Arkansas Pink Vine Ripe Tomato is both the official state fruit and the official state vegetable of Arkansas)?  But, nonetheless, the Amended Complaint here does set forth more than enough facts to have survived a motion to dismiss for what will be factually evident for the following reasons:

## I.    Prefatory Statement relative to BNSF and Corwith Yard.

The Railway Defendants own Corwith and have owned Corwith since its construction way back in 1887. (http://en.wikipedia.org/wiki/Corwith_Yard)(last

accessed on September 21, 2012). They own the land. They own the buildings on it. They own the railroad tracks coming into and out of Corwith. They own the vehicles that load the railcars that enter and leave Corwith. In sum, Plaintiffs claim that The Railway Defendants "owned, was in control of, and was ultimately responsible for the premises of Corwith." (A at 8; ¶ 17.)  But running with the land was the legacy of a pension set-up between The Railroad Defendants and the Teamsters some 60 years ago. (A. at 9; ¶¶ 19-20.)  Over these 60 or so years, The Railroad Defendants have either operated the yard through a subsidiary or through multiple operators, such as RTS. (A. at 8-9; ¶¶ 17-18.) The Railroad Defendants deem the Teamster pension as a liability. (A. at 9; ¶ 19.) So do all of the Defendants. Id. But none of them can be held liable for interfering because they weren't the employer, or as RTS says, they only wanted the work.

## II.    ERISA Section 510 Liability Does Not Depend On An "Employment" Relationship.

The Railway Defendants and TCIU argue that because they were not the direct "employers" of the individual plaintiffs while co-defendant RTS operated Corwith Yard, they should not now be held liable for their role in this scheme to terminate RTS and install TCIU as the company union.

This argument fails for the simple reason that ERISA §510 does not limit liability to "employers" but rather, its broad provisions encompass all "persons" who "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary … for the purpose of interfering with the attainment of any right to which such participant may become entitled under the Plan, this subchapter …"  29

2

U.S.C. §1140.  Congress showed its intent to have §510 apply broadly, by defining a "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."  29 U.S.C. §1002(9).  The word "employer" isn't even in this section.

Indeed, the Courts have consistently allowed "interference" actions against non-employers since ERISA §510 was enacted.  For example, courts have allowed claims against a supervisor, individually, for trying to unduly influence an injured worker not to make use of his health/disability insurance (*Warner v. Buck Creek Nursery*, 149 F. Supp. 2d 246, 251, 258 (D. W.V. 2001)); against an insurer who forces an employer to fire an employee for exercising his rights under a plan (*Tingey v. Pixley-Richards*, 953 F.2d 1124, 1132 n.4 (9th Cir. 1992)); and, most strikingly, against two of the defendants here ( BNSF, and Santa Fe Terminal Services, Inc.) who conspired together to interfere with ERISA protected rights of the yard workers (*Inter-Modal Rail Employees Assoc. v. The Atchison, Topeka and Santa Fe Ry. Co.*, 80 F.3d 348, n.5 (9th Cir. 1996), *aff'd*, 520 U.S. 510 (1997)).

There is evil genius at work here. Namely, by whipsawing workers in and out of work at a rail yard that has been owned by The Railroad Defendants for approximately one hundred twenty-five years you can get out from underneath paying into a pension and you can intermittently get out from paying either Social Security benefits or RRA benefits. The way that has been done, as set forth in the Amended Complaint is through a series of intermediaries that have ran Corwith

Yard, last of which was RTS, which employed the Plaintiffs as the scheme developed, (as described in the Amended Complaint), the Railway Defendants paid into the Teamster benefit plans for years. Prior to the Railway Defendants' canceling RTS' contract, the individual Plaintiffs had anticipated and accrued credits towards the Teamster pension plan that had been in effect for these 60 years. (A. at 4-7; ¶¶5-10.) In addition to the Teamsters' pension, the putative "employer" (RTS and its predecessors, such as named defendant Santa Fe Terminal Services) had been paying into Social Security on behalf of the Plaintiffs, who had been accumulating credit toward that benefit. (A. at 11; ¶27.)

The scheme as alleged in the Amended Complaint involved RTS and the other defendants inducing the Teamsters to give over $1,000,000 in wage, health, pension and welfare concessions to the Railway Defendants and RTS by July 2010 (despite having a contract through 2013). (A. at 12, 16-17; ¶¶31, 40, 41.) Unbeknownst to the Teamsters at the time, however, the Railway Defendants had already inked a contract with TCIU to become the individual plaintiffs' "paper union" at Corwith, on June 16, 2010 – at the least –one month prior to extracting concessions from the Teamsters.[1] (A. at 12; ¶30.)

Through this scheme, the Railway Defendants - working together with TCIU and RTS - interfered with plaintiffs' rights to the Teamsters' pension and other

---

[1]Under the Railway Labor Act, 45 U.S.C. §151 First, §152 First, Fourth, bargaining and agreements with a railroad for a particular class of employees is done system-wide, unless there is a non-captive entity (like, for example, RTS or Santa Fe Terminal Services, as was the case here) running the yard. Then bargaining and agreements can be done locally. At Corwith, the Railway Defendants ran the yard (at one time) via Santa Fe Terminal Services or (at another time) through another servant, such as RTS.

ERISA protected benefits, by playing the Teamsters off of TCIU to see which Union would give more concessions. On June 16, 2010, the Railway Defendants knew with certainty what the terms of a TCIU agreement would look like, and thus knew the extent to which they could demand concessions from the Teamsters. They could then make the decision whether to retain RTS and the Teamsters, or go with TCIU. Ultimately, the Railway Defendants canceled RTS' contract, and went with the pre-negotiated TCIU contract. (A. at 11; ¶26, 27.) Indeed, the TCIU agreement is special to Corwith: it contains vastly inferior wages, benefits, job protections, than the Teamsters' contract, and does not even come close to the TCIU national agreement for wage or benefit increases for TCIU workers in other rail yards. (A. at 11-13; ¶¶29-33.) And TCIU says it did not conspire to interfere with Plaintiffs' ERISA benefits but never explains why TCIU would negotiate a vastly inferior labor contract that only applies to the workers at Corwith. Why not just join the newly acquired Corwith workers to TCIU national labor contract that applies to all of TCIU's other intermodal workers? Just a guess, that's not what TCIU's master, The Railroad Defendants, wanted.

The Railway Defendants were able to stop paying into the Teamster pension plan, stop paying into the Teamster welfare and other benefit plans, stop paying into Social Security; and now they only have to pay into the Railway pension (inasmuch as TCIU has no employer funded pension benefit under its Collective Bargaining Agreement). (A. at 11, 12-13; ¶¶27, 32, 33). Furthermore, the Plaintiffs, even those who had worked at Corwith for years, were now made "probationary"

employees of the Railway Defendants for nine months, subject to discharge for no reason, with no grievance rights, with a loss of all seniority, a loss of their Teamster health insurance, a loss of their Social Security credits, and with a reduction in pay[2]. (A. at 4-7, 11; ¶¶5 -10, 27, 28). What a racket! This is a scheme to get from paying a pension, and possibly skirt paying Social Security or RRA benefits. Even though it was done (as alleged) and pled in Plaintiff's Amended Complaint this is somehow not plausible. Or is it that Plaintiffs didn't plead enough facts?

The game is to systematically and periodically switch back and forth between sham intermediary yard operators, as was done here, and now operate the yard themselves; and "discharging" and "rehiring" the same workers (A. at  11-12; ¶¶ 27 -29); and by playing the local union off of a national union, here, TCIU as a willing participant, the Railway Defendants have shed themselves of anticipated ERISA liabilities[3], and TCIU has gained additional dues paying union members, albeit

---

[2] Under the Railroad Retirement Act, 45 U.S.C. §231a, an individual is vested in the Railroad pension after ten years of service to a qualified "employer." An "employer" under the RRA is an entity that is either a carrier by railroad that also operates a rail yard, or a captive entity of a railroad which operates a rail yard. 45 U.S.C. §231(a)(1). Otherwise, if the entity that operates the rail yard is not "directly or indirectly owned or controlled by" a carrier by railroad, that entity contributes to Social Security rather than the Railroad pension. Thus by transitioning employment from an allegedly non-captive entity, RTS, to employment with the Railroad, the workers stopped accruing Social Security benefits and started, from scratch, accruing Railroad retirement benefits. So in this case, if the Corwith workers make it past their 9 month probationary period---per the TCIU contract (for jobs they have been doing satisfactorily for years already as a Teamster) then they will have to work an additional 10 years to get RRA benefits. Great deal! They lose their ERISA pension rights and now have to work an additional 10 years to get RRA benefits.

[3] The Railroad Defendants get out from either paying the pension directly if they run the yard themselves through a railroad subsidiary like Santa Fe Terminal Services, which they did in the past. Or, even better, if they can get rid of the workers with an ERISA pension then they can pawn off the work on a sham yard operator such as RTS and the Railroad Defendants can pay a company like RTS less money because there is no pension

making vastly inferior wages then there colleagues working at other intermodal yards.

Ultimately, all of these Defendants' argument "not me", or I couldn't have interfered with Plaintiffs' pension benefits must fail because the term "employer" just is not in the statute, and an employer/employee relationship is not a pre-requisite to liability under §510.   If there's any residual doubt that a non-employer may be sued for interfering with a person's ERISA rights, the Seventh Circuit just this year put the final nail in the coffin on that argument.  *Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675 (7th Cir. 2011); *see also, Mattei v. Mattei*, 126 F.3d 794, 801-02 (6th Cir. 1997) (cataloging, and rejecting, cases that limit liability to the employer/employee relationship).

For these reasons, this Court must reject the Railway Defendants' and TCIU's argument that they can have no liability under ERISA §510 because they were not the "employer" of the individual plaintiffs

## III.    There is no requirement to plead a specific intent to interfere with ERISA rights to state a claim under Section 510.

The Defendants argue that the Plaintiffs have not pled a "specific intent" to violate their ERISA rights.  Ignoring, for a minute, that the entire Complaint revolves around the Railway Defendants' scheme to terminate the 60 year Teamster pension plan, Federal Rule of Civil Procedure 9(b) does not require the pleading of "intent", specific or otherwise:  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  As the Fifth Circuit reasoned in an

---

that RTS would have in turn have to pay into.  Either way, the Railroad Defendants make off like robber barons.

ERISA §510 case where the defendants argued that the Complaint did not allege "specific intent": "describing a state of mind with exactitude is inherently difficult and would lead to a complexity and prolixity in pleadings." *Heimann v. National Elevator Industry Pension Fund*, 187 F.3d 493, 509 (5th Cir. 1999) (reversing dismissal of plaintiffs' ERISA claim for failure to allege "specific intent"). More to the point, the Court reasoned that "the use of the term 'specific intent' or other ERISA terminology is not sacramental or necessary to the pleading of a cause of action" under §510. *Heimann*, 187 F.3d at 509.

### 1.    The Railway Defendants

Here, despite no requirement for the Plaintiffs to plead intent, the Court can nevertheless infer the Railway Defendants' "intent" to interfere with the Plaintiffs' ERISA expectancy from the allegations. The Railway Defendants and TCIU certainly did not "accidentally" or "negligently" enter into negotiations and a contract, knowing that RTS and Local 705 already had a contract in place; and the terms of the TCIU contract were not "accidentally" more favorable to the Railway Defendants than the existing RTS - Local 705 contract. These were specific acts undertaken by the Railway Defendants and TCIU, to achieve a specific goal: to reduce the Railway Defendants' pension and other labor costs through subterfuge, unfair dealing and conspiracy.

And although they further argue that they can have no "specific intent" absent a financial gain (which is alleged, by the way, A. at 12-13; ¶¶31, 32), that is simply not the law. ERISA §510 only requires an interference with a protected

right, regardless of the motivation.

## 2.    Transportation Communications International Union

As to TCIU, again, their "intent" to interfere is alleged and can be inferred.
First, it is alleged that in mid-June 2010, TCIU and the Railway Defendants
entered into a labor agreement that was specifically negotiated for and only for
Corwith. (A. at 11-13; ¶¶29-33.) At the time, however, TCIU did not actually
represent the workers at Corwith, because Local 705 was the sole representative of
the Corwith workers through December 2010.  A lowball contract offer from TCIU
under these circumstances would necessarily have interfered with Local 705's
memberships' rights by undermining the terms of the existing labor agreement.
And TCIU would have known this. Indeed, the TCIU contract contained all sorts of
"sweeteners" that the Local 705 contract did not have:  the TCIU contract has no
pension contribution duty; no health and welfare plan; no grievance rights under
certain circumstances---notably no grievances allowed for probationary employees;
and the TCIU contract expressly provided that national wage increases will <u>not</u> be
applied at Corwith.

The "specific intent" of TCIU was to get the Corwith labor contract from Local
705 at all costs, by undercutting a pre-existing, long term contract that Local 705
has held for 60+ years at Corwith, even if the workers TCIU purportedly
"represent" suffered the loss:  loss of wage increases, loss of health benefits, and
ultimately, the loss of a 60+ year pension plan.  Indeed, TCIU entered into this
agreement even though it put the workers at Corwith below the contract benefits

9

that TCIU had under its national contract with the Railroads.

### 3.    Rail Terminal Services

The Amended Complaint also informs RTS of its "specific intent" to deprive the plaintiffs of their ERISA rights.  First, by terminating the plaintiffs, they *prima facie* "discharged" them under circumstances where the plaintiffs would necessarily lose their ERISA rights, under §510.  Next, the plaintiffs have, indeed, pled sufficient facts to show RTS' "intent."  The plaintiffs allege that RTS was the sham operator at Corwith, with the Railway as the "true" entity running the show, making all management decisions there.  As the Railway's "servant" at Corwith, RTS negotiated with Local 705 under the circumstances discussed above. When the Railway decided to take the sweetheart TCIU labor contract, instead of the Local 705 concessions, RTS' discharge of the individual plaintiffs, at the direction of their Railway masters, was done for the purpose of interfering with their ERISA rights, under §510. (A. at 8-9, 11; ¶¶17, 18, 26-28.)

RTS would have the plaintiffs plead facts against their affirmative defense to the claim, for example, "plaintiffs fail to allege any facts as to the possible motivation for RTS to entirely shut down a profitable operation," [RTS Br. fn 5. p. 8], but it's simply not the Plaintiffs' burden to plead around affirmative defenses. There are no allegations in the Amended Complaint to show that RTS was profitable or not, and regardless of if it was, the plaintiffs have alleged that RTS did the Railway's bidding in discharging the individual Plaintiffs for the purpose of interfering with their ERISA rights.  *See, e.g., Tingey v. Pixley-Richards*, 953 F.2d

1124, 1132 n.4 (9th Cir. 1992)(claim of interference sufficient for ERISA violation).

Put another way, RTS was eager to be The Railroads intermediary to beat

concessions out of Plaintiff. Therefore, the Railway Defendants', TCIU's, and Rail

Terminal Services, Inc.'s "specific intent" is not a basis to have had Plaintiffs'

complaint dismissed with prejudice.

## IV.  The Related Corporate Defendants Can Be Held Liable For Their "Direct Participation" in the Scheme To Deprive Plaintiffs Their Rights.

The "related" corporate defendants (Burlington Northern Santa Fe LLC,

Burlington Northern Santa Fe Corporation, and Santa Fe Terminal Services, Inc.)

argue that they can have no liability here for their own conduct in interfering with

Plaintiffs' ERISA guaranteed rights, because "allegations against corporate

subsidiaries, without more, fail to state a claim against the parent."  (Railway

Defendants' Br. p.36-39.) RTS makes a similar argument. (RTS Br. at 27.) However,

the allegations in the Amended Complaint are not against a "subsidiary" but rather

against all the Defendants for their *own* "direct participation" in this scheme.

Both the Illinois Supreme Court and the Seventh Circuit have recognized

that a corporate "parent" can be liable for the acts of a subsidiary, if the parent

directly participated in the wrongful conduct.  *Forsythe v. Clark USA, Inc.*, 224 Ill.

2d 274 (2007); *Esmark Inc. v. N.L.R.B.*, 887 F.2d 739 (7th Cir. 1989).  Thus, a

"parent corporation may be held liable for the wrongdoing of a subsidiary where the

parent directly participated in the subsidiary's unlawful actions."  *Esmark*, 887 F.2d

at 757.  Indeed, where the parent uses its "ownership interest to command rather

than merely cajole" courts should impose liability.  *Esmark*, *id.*  Courts have held

parent companies liable under "direct participation" liability for "patent or copyright infringement, false advertising, fraud, conversion …" *Esmark,* 887 F.2d at 756 (footnotes omitted, internal quotations omitted).

Here, the Plaintiffs have alleged that the Railway Defendants knew of the Plaintiffs' employment relationship because they were employed under a written contract which fixed the terms of their employment (A. at p.16 ¶40); and in 18 pages of allegations, that the Railway Defendants "decided to  intentionally interfere with Plaintiffs' employment relationship … and their legitimate expectancy of continued direct employment … for the purpose of depriving Plaintiffs of or reducing the levels of the ERISA-protected 'fringe' benefits of their employment."  (A. at p.16-17; ¶41.) Finally, Plaintiffs have alleged that "the Defendants" acted against Plaintiffs for exercising their ERISA rights; and that the Plaintiffs suffered their loss "as a direct and proximate result *of all of the Defendants'* aforesaid tortuous actions."  (A. at 17-18; ¶¶43-44.)

Plaintiffs are not seeking to "pierce" any corporate veil, but rather, are seeking to hold a wrongdoer directly liable for its own conduct.  For their part, the Railway Defendants have previously admitted that ownership of Corwith was joint amongst them - the "parent-subsidiary" relationship, if any, intentionally blurred. (Railway Defendants' Mot. to Dismiss, p. 2 [Dist. Ct. Doc. # 15]).  As such, the Plaintiffs have adequately pled a claim for relief against all of the "parent" defendants under the notice pleading standards of Fed. R. Civ. P. 8(a).

Notwithstanding the fact that Plaintiffs are seeking to hold each of the

Defendants accountable for each of their own intentional bad conduct, *arguendo*, even if this Court were to entertain the RTS, RMS, Carrix and TCIU defendants arguments that they were just following orders of the Railway Defendants, at the very least, a master-servant relationship cannot be decided on a Rule 12(b)(6) motion because whether a defendant was acting as one's agent under Illinois law is a factual matter. *Browning v. AT&T Corp.*, 682 F. Supp.2d. 832, 840 (N.D.Ill.2009); *see also*, *Doyle v. Shlensky*, 120 Ill.App.3d 807, 458 N.E.2d 1120, 1131 (Ill.App.Ct.1988)(whether an agency relationship exists is generally a question of fact).

## V.    Plaintiffs Adequately Pled that Defendants Conspired to Deprive Them of their ERISA Rights.

The Railway Defendants, RTS, and TCIU next argue that the Plaintiffs cannot maintain a conspiracy claim because the Plaintiffs do not allege how any Defendant entered into a conspiratorial agreement with any other Defendant, or specific acts taken in furtherance of the conspiracy. This ignores most of the Amended Complaint, however, which more than adequately sets out each of the Defendants' role in this scheme.

Under Illinois law, a civil conspiracy is simply, "two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994). A co-conspirator who knows of the "general objectives" of the conspiracy and accepts the benefit of the tortuous act will be held liable as well. *Adcock*, 164 Ill. 2d at 64.

13

1.     **The Railway Defendants**

Here, the Plaintiffs have pled all elements of a civil conspiracy among the

Defendants.  First, Plaintiffs have alleged that two or more persons took part in the

conspiracy:  the claim arises because the Railway Defendants, with full knowledge

that RTS and Local 705 had a collective bargaining relationship, entered into an

agreement with TCIU for TCIU to represent the same employees who at the time

were already represented by Local 705.  (A. at 12,11; ¶¶30, 31, 27.)  This was done

*long before* the Railway Defendants terminated the contract with RTS:  *to wit*, the

Railway Defendants - TCIU contract was made in June 2010, but the Railway

Defendants had not terminated RTS at the time of making that contract and thus

Local 705 was the lawful bargaining representative of all the workers at Corwith;

the Railway Defendants still had not terminated RTS until well *after* Local 705 had

made concessions on its contract, terminating the Local 705 sometime in January

2011.  (A. at11,12; ¶¶26, 30, 31.)

The Railway Defendants were playing the two unions' concessions off of each

other, with the TCIU "sweetheart" contract in its pocket just in case.  This is the

"unlawful purpose" here, bargaining with two separate, distinct unions covering the

same exact class of members at the same time⸱⸱⸱i.e., the Railway Defendants and

RTS were bargaining with TCIU and the Teamsters over the benefits of workers

that only the Teamsters could lawfully represent at the time, inasmuch as this

rigged "bargaining" was done with the intent of interfering with the plaintiffs'

ERISA protected rights, in violation of §510, which unlawful activities also

14

interfered with the individual plaintiffs association with the Teamsters. Under either the TCIU agreement, which by its terms applies only to Corwith or the "renegotiated" Local 705 agreement, the Plaintiffs suffered a complete loss or a drastic reduction in their ERISA benefits.

### 2.    Transportation Communications International Union

Notably, TCIU took part in the scheme. First, when TCIU and the Railway Defendants entered into negotiations and their labor agreement, TCIU was decidedly *not* the authorized representative of the workers at Corwith: Local 705 was. TCIU had no business, under the Railway Labor Act, or otherwise, negotiating a sweetheart contract with the Railway, which contract only pertained to Corwith. Curiously, TCIU negotiated a contract for people it did not represent and excluded those members from the national contract TCIU had under the Railroad Act. From the get-go, TCIU had no legal right to negotiate the contract it made: it was negotiating wages and benefits for workers who had not authorized it to do so.

Next, the Court can easily infer that TCIU, as the system-wide bargaining representative of the class of employees represented by Local 705 at Corwith, knew that Local 705 and RTS had an existing agreement. Furthermore, because the TCIU contract with the Railway Defendants is specific to Corwith (A. at11-12; ¶29), the Court can infer that TCIU "specifically intended" to undercut the RTS - Local 705 agreement. For example, the BNSF-TCIU contract has no mandatory employer pension obligation; no grievance procedure under certain circumstances, including for example, no grievance procedures for 9 month probationary period; no

15

nationwide wage increases. TCIU knew that it was negotiating a contract that the Railway Defendants, through RTS, would play against the Local 705 concessions.

Subsequent to the Railway Defendants' terminating RTS' agreement (and with it, Local 705), TCIU by operation of law became the bargaining agent at Corwith, with its sweetheart deal in hand.  Under *Adcock*, TCIU can be held liable as a co-conspirator because it (a) knew of the general objectives of the Railway Defendants' scheme (to play the concessions off against one another, violate the Railway Labor Act), and (b) accepted the benefit of the scheme (TCIU is now the bargaining representative at Corwith) with more union dues paying members. TCIU, more than that, actively participated in the scheme, and profited by becoming the bargaining representative at Corwith.

### 3.    Rail Terminal Services, Inc.

Rail Terminal Services, Inc., likewise took part in the conspiracy.  The Plaintiffs have alleged that RTS was a sham operator at Corwith, with the Railway Defendants making all management decisions, and controlling operations, through them as willing servants. (A. at 8-9; ¶¶17, 18).  The Plaintiffs further allege that RTS went along with the conspiracy by engaging Local 705 in "renegotiating" the labor agreement, under circumstances where the Railway Defendants already had the TCIU agreement in hand (A. at 12; ¶¶30, 31).  RTS was a necessary and willing participant in the Railway's scheme, and therefore part of the conspiracy.

Therefore, this Court must find that the Plaintiffs have adequately pled a claim for a conspiracy among the Defendants in the Amended Complaint.

**VI.    Local 705 Has Associational Standing to Represent Its Membership for Violations of their Right to ERISA Benefits.**

The District Court did not decide this issue. The Plaintiffs did not raise this issue in their Appellate Brief. But the Railway Defendants, nonetheless, did brief this issue in their Appellee Brief. (Railway Defs.' Br. at 39-40.) For that reason, if this Court decides to reach this issue then Plaintiffs' union, Teamsters Local 705, has "associational standing" to represent its membership, despite the Railway Defendants' assertion to the contrary, because as a labor union, the membership authorized and in fact, relied on it, to protect their "income and benefits" in dealing with the Defendants.  The United States Supreme Court has long recognized the right of a labor union to assert claims for the protection of "benefits" on behalf of the union's membership.  *International Union v. Brock*, 477 U.S. 274 (1986).  More to the point, the Seventh Circuit has also explicitly held that a union has associational standing under §1132 of ERISA and Fed R. Civ. P. 23.2: "we do not think that by confining the right to sue under section 1132(a)(1) to plan participants and beneficiaries Congress intended to prevent unions from suing on behalf of participants."  *So. Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919, 922 (7th Cir. 2003)[4].

The union only need show:

"(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief

---

[4]Railway Defendants misread the case by stating that "ERISA provides no rights for labor unions." But the *So. Illinois Carpenters Welfare Fund* case holds the opposite of what Railway Defendants state, namely the case holds that a union can sue on behalf of its members. 326 F.F.3d 919, 922 (7th Cir.2003).

requested require the individual members in the lawsuit"
*International Union*, 477 U.S. at 282, *citing, Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Here, the members of Local 705 would have standing to assert the fraud perpetrated on them which interfered with their ERISA and other rights. Tellingly, all of those ERISA rights are *derived from* their membership in Local 705 - for example, the pension plan is established through a collective bargaining agreement between RTS and Local 705.

Second, no union function (other than collective bargaining) could be more "germane to the organization's purpose" than protecting the rights of its members who fall victim to the wrongful acts of their employers. Certainly the Illinois Supreme Court thought so in *Operating Engineers Local 148 v. Illinois Dept. of Employment Security* 215 Ill. 2d 37 (2005) (union had standing to represent members in claim for unemployment benefits, who were denied such benefits during a strike).

One of the factors relied on by the Illinois Supreme Court was that the union was the agent for the members for "the purpose of furthering their work-related interests, *particularly income and benefits*" and that the union "sought to protect the interests of its members to income *and benefits*. Such a goal could not be more germane to the purpose of the union." *Local 148*, 215 Ill. 2d at 51 - 52 (italics added). The U.S. Supreme Court, ruling in favor of finding associational standing, reasoned that unions, "can draw upon a pre-existing reservoir or expertise and capital," and that the doctrine "recognizes that the primary reason people join an

18

organization is often to create an effective vehicle for vindicating interests that they often share with others … to permit the association or corporation in a single case to vindicate the interests of all." *International Union*, 477 U.S. at 289 (internal quotations omitted).

Significantly, both *International Union* and *Local 148* dealt with legislatively created "benefits," whereas the case before this Court deals with benefits *created by the union itself.* There is a closer connection of the benefits here *vis-à-vis* the "association" and its membership than existed in *International Union* and *Local 148.*

There is no difference between a union's seeking to protect unemployment benefits of the membership, and a union's seeking to protect ERISA benefits of the membership, as here. Benefits are benefits, no matter what their source. It would give an absurd result to tell the membership that Local 705 can represent them to establish the pension plan and other benefits in the first place, i.e., bargain to establish the right to ERISA benefits, and maintain that pension through successive employers over 60+ years, but that Local 705 had no "standing" to defend them when their rights under those same plans are threatened. Such a goal as protecting the ERISA rights of its members could not be more germane to the purpose of Local 705.

Finally, the participation of the individual claimants is not necessary for a full determination of the issues. The overarching issues of this case are whether the defendants, individually and in conspiracy, interfered with the memberships'

ERISA guaranteed rights. Although some of the members' damages may need individual calculation (like in *Illinois Carpenters Welfare Fund*), such a determination is not central to whether liability is imposed.

While the Railway Defendants claim that Local 705 lacks standing under ERISA's enforcement mechanism, 29 U.S.C. §1132(a)(1) because Local 705 is not a "participant or beneficiary", this ignores the fact that Local 705 does not act here solely on its own behalf, but on behalf of its entire membership at Corwith who have been aggrieved by the Railway Defendants' conduct. That's exactly why the courts created the doctrine of "associational standing" - to allow an appropriate association to represent its constituent members' rights in accordance with the organization's purpose.

For these reasons, if this Court decides to reach this issue then this Court must therefore find that Local 705 has associational standing to represent its aggrieved membership in this action.

## <u>CONCLUSION</u>

For the above reasons stated in this Reply Brief, and for the additional reasons that are contained within Plaintiffs' Appellate Brief, Plaintiffs-Appellants: Teamsters Local 705; Johnny R. Thomas; James J. Kane; Felipe Gonzalez; Jose A. Morales; Richard W. Kassl; and, Santos M. Marinez, respectfully requests this Court reverse the decision of the district court and remand the case for further proceedings.

Respectfully submitted this 21st day of September 2012.

  s/Nicholas C. Kefalos
Nicholas C. Kefalos
IL ARDC # 6270051
**VERNOR MORAN, LLC**
27 North Wacker Drive, Suite 2000
Chicago, Illinois 60606-2800
(312) 264-4460
(312) 264-4461 (fax)
nkefalos@vernormoran.com
Attorney for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

I, Nicholas C. Kefalos, an attorney, certify that:

1.      This brief  conforms to the rules contained in F.R.A.P. 37(a)(7)(B) because this brief contains xxx words, including punctuation and spaces, but excluding the parts of the brief exempted by F.R.A.P. 37(a)(7)(B)(iii), as reported by Microsoft Word 2007 for Windows.

2.      This brief complies with the typeface requirements of F.R.A.P. 32(a)(5), as modified by Circuit Rule 32(b), and the type style requirements of F.R.A.P. 32(a)(6), because this brief has been prepared in a proportionately spaced serif typeface, namely, this brief has been prepared in 12 point Century font, 11 point Century font for footnotes, using Microsoft Word 2007 for Windows.

Dated:  September 21, 2012              s/Nicholas C. Kefalos
                                       Nicholas C. Kefalos

## CERTIFICATE OF SERVICE

I, Nicholas C. Kefalos, certify that on September 21, 2012, an electronic copy of the Reply Brief was served on all counsel of record via the Court's CM/ECF system, only:

Donald J. Munro
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001

Clifford Raymond Perry, III
Laner, Muchin, Dombrow,
Becker, Levin & Tominberg, Ltd.
515 North State Street
Suite 2800
Chicago, IL 60654

Jeffrey Andrew Bartos
Guerrieri, Clayman, Bartos &
Parcelli, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036

Dated: September 21, 2012

  s/Nicholas C. Kefalos        
Nicholas C. Kefalos